UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LA WUANDIA WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cv-00469-TWP-MJD |
| | ) | |
| REPUBLIC AIRWAYS HOLDINGS INC, | ) | |
| DONALD GIBSON, | ) | |
| SARA GLORE, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed pursuant to
Federal Rule of Civil Procedure 56 by Defendants Republic Airways Holdings Inc. ("Republic"),
Donald Gibson ("Gibson") and Sara Glore ("Glore") (collectively, "Defendants") (Filing No. 176).
Following termination of her employment as a flight attendant for Republic, Plaintiff La Wuandia
Williams ("Williams") initiated this action against Defendants — and her union representative
Michael Winegar, who has since been dismissed from the case — alleging violations of 42 U.S.C.
§ 1981 ("Section 1981").  Specifically, Williams alleges she was discriminated against because of
her race, and after she complained about the race discrimination, Defendants terminated her
employment in retaliation.  For the reasons explained below, summary judgment is **granted**.

## I.     BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of
Civil Procedure 56, the facts are presented in the light most favorable to Williams as the non-
moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Zerante v. DeLuca*,
555 F.3d 582, 584 (7th Cir. 2009).

A.  **Williams' Employment as a Republic Flight Attendant**

Williams, an African American female, was hired as a flight attendant by Republic in April 2019.  Defendant Gibson (white male) was the Republic in-flight manager in charge of all flight attendants and Williams' second-line supervisor (Filing No. 100 at 2).  Defendant Glore (white female) was Republic's HR manager and participated in Williams' suspensions and termination. *Id*.  The first nine months of active service for Republic flight attendants is served in a "Probation Period," which would have concluded in January 2020 for Williams.  (Filing No. 176-11 at 69), *see id.* at 248.  The Probation Period allowed certain deviations from Republic's Flight Attendant 2013 Collective Bargaining Agreement ("Collective Bargaining Agreement"), such as the right to arbitrate grievances concerning discipline or discharge did not extend to probationary flight attendants, nor did the agreement require that such discipline or discharge be based on just cause. *Id*. at 99.

1.       **Republic Expectations and Policies**

Williams recognized that the airline industry places importance on planes taking off and arriving on time (Filing No. 176-6 at 27).  Being on time and attendance were emphasized in Williams' training, and she agreed that flight attendants, more than employees in other jobs, had to be punctual so planes could depart according to schedule, and that planes departing and arriving on time was a significant element of the industry.  *Id.*

Overnight stays are also a regular part of the job, and overnight lodging, whether at the employee's home base location or in various destination locations outside the home base location, is necessary for a variety of reasons, such as flight cancellations or delays and weather (Filing No. 176-2 at 2-3).  Republic's assistance in procuring lodging for flight attendants at home base locations is predicated upon accommodations being possible at no additional cost to the company,

and not being already taken by flight attendants traveling overnight in destination locations. *Id.* at 3. Republic has occasionally assisted flight attendants with such accommodations. *Id.* This provision of assistance stands outside of any contractual agreement, and Republic flight attendants needing overnight lodging at their home base are not entitled to such lodging. *Id.* at 3-4.

The Collective Bargaining Agreement and the Flight Attendant Manual (the "Manual") both set forth the responsibilities and rights between Republic and its flight attendants ([Filing No. 176-4 at 3](#)). The Collective Bargaining Agreement, states that any flight attendant who is unable to report for duty must notify Republic's crew scheduling department "as far in advance as practicable" ([Filing No. 176-11 at 47](#)). The timing of this notice, or lack of notice, impacts the flight attendant's employment pursuant to Article 29 of the Collective Bargaining Agreement, which outlines an attendance policy that places on each flight attendant the "responsibility to report to work on time," so "that in rare instances of excessive absenteeism from the job, Flight Attendants are treated impartially and fairly." *Id.* at 142. Williams understood she was subject to the attendance program set forth in Article 29 during her employment ([Filing No. 176-6 at 46](#)).

Republic has a no-fault attendance policy, meaning it does not consider flight attendants' reasons for missing work or failing to follow procedures in providing notice to crew scheduling, unless the reason "stands rooted in medical reasons (or other basis rooted in the law)" ([Filing No. 176-4 at 7](#)). Article 29 explains that each flight attendant is required to contact the scheduling department "as soon as possible regarding her absence or tardiness, unless unable to do so for reasons beyond her control" ([Filing No. 176-11 at 142](#)), and Republic has operationalized the language, "for reasons beyond . . . control," to apply to "medical/personal health reason[s]" that prevents calling, but not to apply to reasons "caused by poor planning, cell phone malfunctions, or other 'the dog ate my homework' reasons". ([Filing No. 176-4 at 3](#).)

Under the Article 29 attendance policy, flight attendants accrue cumulative attendance events, or "occurrences" of absenteeism/tardiness on a rolling twelve-month basis (Filing No. 176-11 at 143–145). A "No Call/No Show," assessed as two occurrences, transpires when a flight attendant "fails to call or show for a scheduled duty assignment, or shows too late to work the scheduled flight, and in either case has not notified crew scheduling in advance that she will be absent or late." *Id.* at 143. Republic records a No Call/No Show anytime a flight attendants fail to "call or report prior to [the] designated report time." *Id.* at 342. Republic assesses a single occurrence whenever a flight attendant is "absent from any portion of scheduled duty (e.g. trips, training, etc.)", reports she is "unavailable for a scheduled day of work or reserve prior to contact [Republic]," or "[r]eports 6 or more minutes late and causes a delay in her own or another flight." *Id.* at 143. Williams admits the Collective Bargaining Agreement establishes that incurring two No Call/No Show events within a twelve-month period, regardless of occurrence total, is grounds for termination, and accumulating eight occurrences in such a period is "subject to termination of employment" (Filing No. 176-10 at 11-12 (quoting Article 29, Collective Bargaining Agreement, Filing No. 176-11 at 144)).

To ensure accurate information regarding the status of employees' attendance history, Republic sends flight attendants a bi-monthly Attendance Review Statement ("ARS") that lists all occurrence and non-occurrence bearing events, as well as the dates and values of all attendance occurrences (Filing No. 176-4 at 8). The purpose of the ARS is to help ensure that flight crewmembers and the Company have accurate information regarding the status of attendance history; and it informs on how to dispute an occurrence. When asked if she recalled how often she received ARS statements, Williams indicated she could not recall, but then later clarified "possibly once a month maybe" "as best [she] can recall" (Filing No. 176-6 at 39).

The performance expectations and rules governing flight attendants' behavior are outlined in the Standards of Conduct set forth in the RJET Navigator Employee Handbook (the "Handbook") (*see* Filing No. 176-11 at 341 at 1066, 1068). Republic generally imposes progressive discipline for attendance and conduct issues, transitioning from a verbal warning to a written warning, and finally a final warning, but discipline may nevertheless "be implemented or accelerated at any step, including termination, depending upon the severity of the situation." *Id.* at 144. Certain conduct violations under the Standards of Conduct include *inter alia*: (1) abusive treatment, or discourteous conduct directed toward another employee, customer, or guest; (2) unprofessional behavior; (3) disruptive or disorderly conduct on Republic property, while on duty; and (4) abuse or violations of any or all Republic policies and operational procedures. *Id.* at 1115-1116.

### 2.     Williams' Initial Occurrences and Behavior

On June 19, 2019, Republic assessed Williams' first attendance occurrence due to an unavailable status, which she attributed to a job-related residence change and subsequently disputed. *See id.* at 271-273. In an email reply to her request to remove the occurrence, Inflight Operations Manager Gibson explained Republic's "no-fault attendance policy" and that Republic would not reverse the assessment because "an extension . . . such as this does not meet the requirements of any of these specific codings" listed in the Collective Bargaining Agreement. *Id.* at 271.

On June 21, 2019, Republic assessed an occurrence based on Williams' partially unavailable status. *Id.* at 1174. Five minutes before a 6:15 a.m. show time, Williams called the crew scheduling department to advise she could not make the show time as she had underestimated the time it would take to get to the airport with traffic. (Filing No. 173 (Defendants' manually filed

audio evidence, Exhibit No. 60); Filing No. 176-11 at 274).  The July 9, 2019 ARS sent to Williams listed both the June 19 and June 21, 2019 occurrences (Filing No. 176-11 at 1174).

On July 27, 2019, Republic assessed a third occurrence due to a sick call, which showed up on Williams' July 31, 2019, ARS.  *Id.* at 1139, 1180, 1205.

On August 6, 2019, Williams incurred her first No Call/No Show event for which Republic assessed two occurrences.  *Id.* at 269, 276. She called crew scheduling approximately fifteen minutes after her show time and advised she was ten minutes away due to a late shuttle. *Id.* at 1139; Filing No. 173 (Defendants' manually filed audio evidence, Exhibit No. 60). Republic issued a "No Call/No Show Review Notice" on the same day that set forth the No Call/No Show definition found in Article 29 of the Collective Bargaining Agreement and stated that contractual provisions required all attendants who anticipated arriving late to notify scheduling *prior* to show time to avoid the No Call/No Show assessment (Filing No. 176-11 at 269).  The Notice also stated "[a]ny future attendance occurrences or dependability issues may lead to further disciplinary action including termination" and advised that support options if needed, were available from Republics Employee Assistance Program. *Id.*

Williams August 31, 2019, ARS listed the August 6, 2019, No Call/No Show event, and informed Williams that she had accumulated 5.0 total occurrences: *Id.* at 1183.

On September 12, 2019, Williams was scheduled for duty on a late-arriving flight from Houston, Texas to her home base location, Chicago, Illinois.  (Filing No. 173 (Defendants' manually filed audio evidence, Exhibit No. 18); Filing No. 176-2 at 3.) Williams contacted crew scheduling, first during the afternoon and then later in the evening, to request lodging near the airport or, in the alternative, a company-provided Uber to avoid late night use of Chicago's public transportation, and Republic ultimately denied both requests.  (Filing No. 173 (Defendants'

manually filed audio evidence, Exhibit Nos. 18–19).)  During both telephone calls, Williams cited concerns for her safety in arriving so late. *Id.*  The evening scheduling member explained to Williams that, while Republic would provide a room if it had any available, it would not request one if rooms were unavailable.  (Filing No. 173, Exhibit No. 19 at 11:20–11:35.)  Williams landed after midnight, and again called crew scheduling several times and asked to speak to an adviser. (Filing No. 173 (Defendants' manually filed audio evidence, Exhibit Nos. 20–22).)  Republic again denied her requests for lodging and for transportation, and explained that Williams was responsible for out-of-base trips with late arrivals, and she would receive an available room if Republic had any  (Filing No. 173, Exhibit No. 20 at 6:17–6:30).  After "going in circles," the adviser ended the call (Filing No. 173, Exhibit No. 22).  Williams' financial situation required her to take public transportation home after midnight, causing her anxiety and fear.

**B.  The September 20, 2019 Meeting and Suspension with Pay**

On September 13, 2019, crew scheduling manager Joey Gray ("Gray") contacted Gibson and Williams' base supervisor, Chelsea Ostermeyer ("Ostermeyer"), to lodge a complaint against Williams on behalf of crew schedulers (Filing No. 176-9 at 4).  Three days later, Gray (a white male) emailed Gibson relevant details, including that Williams called "demanding an uber or hotel because she got in at 1am [sic] due to delays." (Filing No. 176-11 at 207.)  In response, Ostermeyer scheduled Williams for an "official talk," on September 20, 2019.[1]  *Id.* at 207, 1139; Filing No. 176-5 at 2.  Gray provided Ostermeyer and Gibson recordings of the various calls to crew scheduling on September 12 and 13, 2019, and later shared a basic synopsis of Williams' conduct, which Ostermeyer found to be accurate.  (Filing No. 176-11 at 205–207; Filing No. 176-5 at 2–3.)

---

[1] In her response briefing, Williams contends the meeting occurred on September 16, 2019, but does not point to any evidence that establishes the meeting was not held on September 20, 2019.

Prior to the scheduled September 20, 2019, meeting, several events occurred. First, in preparation for the meeting, Gibson accessed a pair of in-flight reviews, commonly referred to as "ghost rides" which are flights observed without a flight attendants' knowledge for training purposes. that had been arranged for training purposes. Both rides mentioned excessive singing and dancing on Williams part, as well as her walking away during a demonstration (Filing No. 176-11 at 1140, 1141; Filing No. 176-2 at 3).

Next, Ostermeyer received a message from Captain Daniel Monts ("Monts")--who was on the third day of a four-day trip with Williams--which reported Williams was "having a lot of issues … on the road" (Filing No. 176-11 at 209, 1140, 1141). Monts wrote that Williams caused "a lot of grief" with fellow flight attendants, *id*. at 209, sang and danced and was very boisterous, and was combative when asked about an incident in which she sang so loud during a deplaning that it forced him to close the flight deck door. *Id.* Monts complained that Williams was combative when she was questioned for holding up boarding after arriving planeside 22 minutes prior to departure instead of the customary 30 minutes, and Williams had been disrespectful to fellow flight attendants which caused cabin issues during flight and two attendants had complained to Monts. *Id.* Monts also stated that "people on almost every leg of this trip [had] ask[ed] if she [was] on something or sober" and that he did not think it was "a good message" to send if customers are questioning Williams' sobriety. *Id*.

Months later, Gibson detailed in an email message another conversation that he had with a different flight captain prior to the scheduled September meeting, wherein the captain described similar behavior by Williams and noted "[s]ome serious concerns," including: not appropriately arming and disarming doors; singing at full volume throughout multiple phases of the boarding process; improvising announcements; approaching an elderly first-class passenger and yelling in her

face that she looked like Janet Jackson repeatedly; and approaching a family in the terminal that was holding up a sign with the name of a family member, and then yell loudly that she was the family member they were waiting for.  *Id.* at 1148.

Prior to the scheduled meeting, union representative Winegar reached out to Ostermeyer to inquire about the purpose for the meeting and he advised that the union's peer-to-peer counseling group had coached Williams on three separate occasions on ways to improve.  *Id.* at 1139; Filing No. 176-5 at 3. Winegar echoed the group's belief that Williams was very combative and resistant to change, he reminded Ostermeyer that she was probationary, and shared his belief that Williams may not be a good fit for Republic (Filing No. 176-11 at 1139–1140; Filing No. 176-5 at 3).

The September 20, 2019 meeting was held as planned with Gibson, Ostermeyer, human resource representative Glore, Williams, and her union representative, Winegar. At the meeting, Gibson accused Williams of making more than thirty calls to crew scheduling that were abusive in nature.  (Filing No. 176-7 at 119–120.)  In a September 24, 2019 email message to Republic Chief Executive Officer Bryan Bedford ("Bedford") memorializing the meeting, Williams wrote that Gibson began the meeting "with an attack on [her] character stating he had some '25' grievances against [her] and numerous allegations"; indicated he had "another conference call within four (4) minutes" and "it would take too long" to present recordings of the crew scheduling calls; concluded without allowing Williams an opportunity to defend herself; and instructed she would remain on suspension "until he . . . decide[d] if [she was] the right fit" for the flight attendant role.  (Filing No. 176-11 at 255.

Defendants recall that Gibson and Glore discussed Williams' onboard behavior and interdepartmental conduct. (Filing No. 176-2 at 3–4). Williams insisted the complaints had not been shared previously and expressed her belief that she had not done anything inappropriate.  (Filing No.

176-11 at 1145.)  She denied providing a non-compliant safety demonstration or engaging in any safety infractions.[2]  Williams asked Gibson to provide examples of her conduct and requested to hear the recorded calls, which Gibson refused citing privacy reasons pursuant to Republic's customary practice.  (Filing No. 176-2 at 4.)  Ultimately, Gibson, Ostermeyer, Glore viewed Williams' response as being combative and devoid of any remorse, and Gibson closed the meeting by advising Williams she would be on a paid suspension until further notice to enable further investigation.  *Id.*

### C.  The October 18, 2019 Meeting and the Job Performance Warning

The ensuing investigation by Republic took longer than expected due to unrelated delays but revealed the following additional items (Filing No. 176-12 at 5; Filing No. 176-11 at 1151–1152). First, on September 26, 2019, Ostermeyer requested and received a statement a from a base supervisor that Williams "started to sing a song loudly" upon the supervisor's boarding introduction, was happy but "was almost obnoxious," sang during the entire boarding process, introduced herself "as Lay's Chips on the P[ublic] A[ddress]," joked during the safety demonstration, and was "very[,] very unprofessional" (Filing No. 176-11 at 210).  Second, on October 2, 2019, a flight attendant who shared a September 16, 2019 flight with Williams reported that he had reached out to professional standards because of Williams' conduct.  Specifically, during the flight an Executive Platinum passenger asked him "if the other flight [a]ttendant . . . was on something," because "of the[] way she was acting."  *Id.* at 211.  The same Executive Platinum passenger opined it was "not normal behavior" and she would be emailing American Airlines.  Third, on October 8, 2019, the flight captain who previously spoke with Gibson sent a message detailing his observations from the July 19, 2019, trip with Williams.  *Id.* at 1126.

---

[2] Republic contends that Williams became irate when questioned about her demeanor on scheduling crew and other interdepartmental calls. Filing No. 176-2 at 4.

In accordance with the procedures set out in Article 18 of the Collective Bargaining Agreement, Glore and Gibson convened a meeting with Williams and Winegar on October 18, 2019, to discuss the investigation.  (Filing No. 176-3 at 3; Filing No. 176-11 at 94.)

At the October 18, 2019 meeting, Gibson accused her of making over sixty abusive calls to crew scheduling and that, when asked, he explained that her excessive calling on September 12 and 13, 2019, served as the basis for the claim that she "consum[ed] company resources."[3]  She was criticized for her hair style and she found offensive "Gibson's description of black passengers as members of her family" (referencing the fourth item outlined in the Final Job Performance Warning) (Filing No. 100 at 10; Filing No. 176-6 at 71–72).  Gibson and Glore did not provide specific details of the allegations and they repeatedly cut off her attempts to obtain further explanation and the identities of the individuals involved.  Gibson referenced Williams' email to Bedford stating something like, "whenever you are confronted with an issue, you go straight to the top. You need to go to your officers first before going straight to the top."  (Filing No. 100 at 8.) *See* Filing No. 176-7 at 102 ("[O]ne comment . . . made by [] Gibson was that, you go straight to the top, you need to in the future, . . . to contact him first.").

Defendants' account of the October 18 meeting differs slightly.  Glore advised Williams that Republic was placing her on a Final Job Performance Warning and imposing a retroactive three-day suspension that ended on October 18, 2019 without pay, an acceleration of the progressive discipline policy due to the severity of the issues and because Williams was still in her probationary period (Filing No. 176-3 at 3; Filing No. 176-11 at 1130, 1166).  In recognition that Williams brought "a lot to the table in terms of potential," Republic would provide her another

---

[3] The following version of events is taken largely from Ms. Williams' Second Amended Complaint (*see generally*, Filing No. 100).

opportunity instead of separating employment (Filing No. 176-3 at 3).  Glore then walked Williams

through the Final Job Performance Warning document, *id.* at 3, which states in part:

> Since your hire date, there have been concerns reported related to safety issues and
> professionalism:
>
> 1. Republic has received complaints from crew members stating your in-cabin
> behavior is excessive and has hindered safety sensitive operations.
> 2. Republic has received reports that you performed a non-standard safety
> demonstration, improperly armed and disarmed your doors and stored passenger
> bags in the front wardrobe.
> 3. You have had complaints formally reported to management regarding your lack
> of professional demeanor when requesting information or making requests of Crew
> Scheduling and that you have been unnecessarily consuming Company resources.
> 4. Republic has received reports of unprofessional behavior with passengers, i.e.
> referring to yourself as Lays Potato Chips during a safety demo, addressing
> passengers and/or family members inappropriately as "Whitney Houston," "Janet
> Jackson," and stating, "I'm Jerry!" to family members holding a sign for their
> returning service member named Jerry.
> 5. You have been verbally counseled by your Base Supervisor regarding the
> concern of the appropriateness of your behavior.
>
> You are in your probationary period with Republic Airways, ending 1/15/20.
>
> Therefore, you are receiving a final job performance warning and suspension for
> the above violations.

(Filing No. 176-11 at 248).  Williams denied misconduct and afterwards messaged Gibson,

Glore, and Winegar disputing Republic's decision, challenging the alleged behavioral findings,

and requesting further investigation.  *Id.* at 1165–1166; Filing No. 176-3 at 4.

**D.  <u>Williams' Return to Work and Termination</u>**

At the time of her three-day suspension, Williams ARS--dated October 15, 2019--reflected

five occurrences assessed from the four previous events (Filing No. 176-11 at 1192). Williams

returned to work on October 21, 2019. The next day, Republic assessed another attendance

occurrence due to Williams' partially unavailable status: when crew scheduling called Williams

eight minutes ahead of her 6:15 a.m. show time, she explained that her alarm did not go off.  (Filing

No. 173 (Defendants' manually filed audio evidence, Exhibit No. 62); Filing No. 176-11 at 212.)
She arrived at the airport at 6:42 a.m.  (Filing No. 173 (Defendants' manually filed audio evidence,
Exhibit No. 63).)  Two days later, Republic sent Williams a notice pursuant to Article 29 of the
Collective Bargaining Agreement, titled "Written Warning – Attendance," which advised her that
she had accumulated at least six separate occurrences and that "[a]ny future attendance occurrences
or dependability issues may lead to further disciplinary action, up to and including termination."
(Filing No. 176-11 at 145, 212.)

On October 27, 2019, Williams incurred her second No Call/No Show event and eighth
occurrence in a twelve-month period.  *Id.* at 281.  Williams explained the events of that day were
"beyond [her] control":  the Chicago public transportation she was riding to the airport for a 10:45
a.m. report time experienced "delays, stops on the tracks" and while she sat underground with no
reception, her calls to contact crew scheduling dropped.  (Filing No. 176-6 at 52–53, 61, 111.)
Once the train surfaced above ground, she contacted crew scheduling to inform them of the
incident and arranged to take an Uber ride rather than the shuttle.  *Id.* at 53.  Williams submitted a
request to reverse the No Call/No Show occurrence, asserting that she "reached out to [her] flight
crew notifying them of a possible delay" but could not contact crew scheduling because, "at
approximately 10:20am," the train "traveled underground where [she] then lost reception, and the
call while attempting to speak with Scheduling dropped."  (Filing No. 176-11 at 287.)

Republic's call records indicate Williams first established contact with the crew scheduling
department at 10:48 a.m., or three minutes beyond her show time.[4]  (Filing No. 173 (Defendants'

_____

[4] When asked if the first call went through at 10:48 a.m., Ms. Williams stated: "In terms of the exact time, . . . I do not
recall noting that I phoned at 10:48 or gave an exact time, as I was not conscious of the time that I have indicated"
(Filing No. 176-6 at 132). Her October 31, 2019 request to reverse the occurrence indicates similarly that she did not
note the actual time and her main concern was contacting crew scheduling and getting to the airport (Filing No. 176-
11 at 287).

manually filed audio evidence, Exhibit No. 23).)  Williams called again at 11:03 a.m. to advise of an estimated arrival time of "about ten minutes;" she arrived on the aircraft at 11:10 a.m., and made a third call circling back at 11:20 a.m. (Filing No. 173 (Defendants' manually filed audio evidence, Exhibit Nos. 23–24); Filing No. 176-6 at 111).

The next day, Republic emailed Williams a "Notification of Meeting – Attendance," scheduling a telephone conference for October 31, 2019, and notifying her that her chargeable occurrence count following the last absence stood at eight (Filing No. 176-11 at 279).  Ostermeyer informed her the same day by telephone that she was being placed on suspension, and Williams explained during the call her account of the October 27, 2019 train ride.  *See id.* at 1202 (Gibson's email indicating to "inform [Williams] of her suspension" when contacting her regarding the notice of meeting for the pair of No Call/No Shows).

On the October 31, 2019, conference call, Gibson explained that Williams "could've used more creativity in getting above ground" to obtain cell phone service. Gibson and Winegar indicated they were going to check the log and placed her on hold, and upon returning, they confirmed and "knew that there was an interruption" underground on the public transit service (Filing No. 176-6 at 87).  Gibson suggested Williams should have called "actually maybe even earlier".  *Id.* at 88. Gibson then explained that Williams' explanation of the events did not negate the No Call/No Show event due to the no-fault nature of Republic's attendance policy.  He verbally advised Williams that Republic was terminating her employment because of her two No Call/No Show events within a twelve-month period and her accumulation of eight (8) occurrences within a rolling twelve-month period, each of which alone stands as grounds for termination.  (Filing No. 176-2 at 5–6.)  In the termination letter from the same day, Gibson wrote that the discussion concerning her for-cause termination centered on Ms. Williams' recent reliability issues;

specifically, that she incurred two No Call/No Shows and eight attendance occurrences in a twelve-month period, which "are **each individually** cause for termination," during the course of her probationary period (Filing No. 176-11 at 214 (emphasis in original)).[5]

Williams filed her initial Complaint against Defendants and Winegar in March 2021 (Filing No. 1).  On  December 5, 2022, Winegar was dismissed with prejudice (Filing No. 142), and Williams has twice amended her Complaint, (*see* Amended Complaint (Filing No. 35); Second Amended Complaint (Filing No. 100)).  On March 23, 2023, Defendants moved for summary judgment (Filing No. 176) and Williams filed several *pro se* response briefs (Filing No. 189, Filing No. 190, and Filing No. 191).  In its reply brief, Filing No. 195, Defendants ask the Court to strike the duplicative filings and several statements and arguments made in Williams' response to their motion, which the Court will address first.

## II.   EVIDENTIARY MATTERS

Although Williams is represented by counsel, the Court has excused counsel's responsibility to respond to the summary judgment motion and Williams is proceeding *pro se* on summary judgment.  (*See* Filing No. 163, Filing No. 170.)[6]  Thus her filings are liberally construed and held to a less stringent standard than formal pleadings drafted by lawyers. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) (discussing *pro se* complaints); *see also Greer v. Bd. of Educ. of City of Chi* ., Ill., 267 F.3d 723, 727 (7th Cir.

---

[5] Williams recalls being told her termination was "because she had made over 100 abusive calls" (Filing No. 176-11 at 228), but when later asked at her deposition whether there was "any other reason given … for [her] termination other than the fact that [she] had received eight occurrences," she stated, "No other" (Filing No. 176-7 at 118–119).

[6] In the Minute Entry dated February 10, 2023, counsel for Williams motion to withdraw was denied, and the Court determined that, "should Ms. Williams demand the submission to the Court of a document or brief, the submission of which [counsel] believes would violate his ethical obligations to the Court, the document may be signed and submitted by Ms. Williams directly, with [counsel] acting as stand-by counsel." (Filing No. 163 at 2.)  Williams' response brief is signed and submitted *pro se* (*see* Filing No. 191 at 26).

2001).  The Court will apply an "understanding eye" to Williams' materials opposing summary judgment to ensure her arguments receive careful analysis.  *See Black v. Rieth-Reily Const. Co.*, 957 F.Supp. 177, 180 (S.D. Ind. 1997).

> However, it is also well established that pro se litigants are not excused from compliance with procedural rules. [T]he Supreme Court has never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel[.] Further, as the Supreme Court has noted, in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.

> *Loubser v. United States*, 606 F. Supp. 2d 897, 909 (N.D. Ind. 2009) (internal citations and quotation marks omitted).  But,

> even pro se litigants . . . must expect to file a legal argument and some supporting authority. A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority . . . forfeits the point. We will not do his research for him.

> *Mathis v. New York Life Ins. Co.*, 133 F.3d 546, 548 (7th Cir. 1998) (citations and quotation marks omitted).

Defendants ask the Court to strike as duplicative, "Plaintiff's Response To Defendants' Brief of Republic Motion for Summary Judg[]ment", filed at Filing No. 190 and Filing No. 191. The Court has previously cautioned Williams "to be more judicious with the parties' and the Court's resources when filing a motion that is duplicative of an already pending motion" and warned her that duplicative filings would likely be stricken.  (Filing No. 171 at 5.)  Williams' numerous responses are confusing and do not comply with the Local Rules.  These filings initially appear to be duplicates of her response at Filing No. 189; however, at closer observation, the Court notes that Williams' third response document, Filing No. 191, contains an attached exhibit that the others lack.  Because *pro se* filings are construed liberally, the Court will accept Filing No. 191 as the

operative Response.  The **Clerk is directed to strike** the responses at <u>Filing No. 189</u> and <u>Filing No. 190</u> as duplicate filings.

Defendants also ask the Court to strike the "Second Exhibit," "Third Exhibit," and "Plaintiff's Exhibits/Witness[es] . . . Erroneously Omitted," filed at <u>Filing No. 192</u>, <u>Filing No. 193</u>, and <u>Filing No. 194</u> respectively.[7]  They argue that Williams' attempt to submit these exhibits disregards the June 6, 2023 deadline imposed by the Court in granting her emergency motion for extension of time (<u>Filing No. 195 at 2</u> (citing May 30, 2023 Order (<u>Filing No. 186</u>)).

Defendants are correct; it is Williams' responsibility to submit "any evidence (that is not already in the record) that the party relies on to oppose" the summary judgment motion.  S.D. Ind. L.R. 56-1(b).  Williams correctly attached an exhibit to her Third Response, *see* <u>Filing No. 191-1</u>, and similarly, she should have attached the materials from the subsequent three filings. More importantly, Williams had ample opportunity prior to the June 6, 2023 deadline to submit these materials.  Defendants moved for summary judgment on March 23, 2023.  The Court first granted Williams' unopposed motion to extend the initial response deadline by twenty-two days, thereby moving it to May 12, 2023 (<u>Filing No. 179</u>).  On the new deadline date, Williams requested another extension of an additional fourteen days in an emergency motion, before again filing on May 26, 2023, for a third extension in a second emergency motion (<u>Filing No. 180</u>, <u>Filing No. 185</u>).  The Court granted an extension to June 6, 2023, but stated "[n]o further enlargement of this deadline will be granted" and the motion for summary judgment would be submitted without her response if she did not file one.  (<u>Filing No. 186</u>.)  In denying as moot another emergency motion for

---

[7] In its Order dated August 21, 2023, (<u>Filing No. 213</u>), the Court had previously stricken from the record the same or similar materials as the exhibits in question which Williams later attached to a document labeled as a surreply, but more properly characterized as an untimely amended response to summary judgment. *See* Proposed Surreply (<u>Filing No. 198</u>), Exhibit Materials (Filing Nos. <u>198-2</u>, <u>198-4</u>).

extension of time filed on May 30, 2023, the Court again stressed no further enlargement would be granted beyond June 6, 2023 (Filing No. 188).

In extending the deadline to respond to June 6, 2023, the Court was sympathetic to Williams' extenuating situations--including the particularities of her relationship with counsel and her need to establish care for an aging parent--which she described in her emergency motions. Nevertheless, at this stage, given the leniency and numerous extensions provided to Williams, good cause does not exist to excuse her failure to comply with Local Rule 56-1.  It is "well established that *pro se* litigants are not excused from compliance with procedural rules."  *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008) (citing *McNeil v. United States*, 508 U.S. 106, 113 (1993)).

The Court's repeated cautions as to the importance of meeting the June 6, 2023 deadline is not the first time Williams has been admonished to comply with deadlines or that the Court has set forth in detail that failure in meeting deadlines could be detrimental to her case (*see* Filing No. 62 at 2 (quoting S.D. Ind. L.R. 7-1(c)(5) ("The court may summarily rule on a motion if an opposing party does not file a response within the deadline.")).  "Deadlines, in the law business, serve a useful purpose and reasonable adherence to them is to be encouraged. . . .  If the court allows litigants to continually ignore deadlines and seek never ending extensions without consequence, soon the court's scheduling orders would become meaningless." *Spears v. City of Indianapolis*, 74 F.3d 153, 158 (7th Cir. 1996) (enforcing the denial of a motion for a one-day enlargement of time to respond to a motion for summary judgment).

Williams' attempts to proffer exhibit materials beyond the reasonable deadlines imposed is **denied** and the **Clerk is directed to strike** Filing Nos. 192–194.  *See Yancick v. Hanna Steel*

*Corp.*, 653 F.3d 532, 536–539 (7th Cir. 2011) (affirming denial of additional time to file exhibits left unattached to "eleventh hour" response brief opposing summary judgment). [8]

Defendants lastly ask the Court to strike certain unsworn assertions in Williams' response brief, including the following:

(1) Gibson "abused his title as Inflight Manager," has "no regard[] or respect of/for God nor man," regarded Williams' "inquir[i]es as a challenge of authority," and "did not appreciate a Black female challenging his authority" ([Filing No. 191 at 2](#));

(2) Defendants' Final Job Performance, signed by Gibson, contained a "discriminatory slur made against" Williams, and that such a "deliberate racist slur" is "perhaps also a source of comedic entertainment by Gibson, who self-professes to consider[] himself a comedian," *id*. at 13;

(3) Defendants and their counsel "willingly participated in illegal actions, to conspire to target, retaliate and inflict discrimination against" Williams, "deliberately act[ed] with unsupportive attempts to confuse the Courts, to fabricate, twist and misrepresent the truth," violated Indiana Professional Conduct Rules 4.1 and 8.4, "should be charged with perjury[]," "fail[] to acknowledge their involvement in illegal behavior," and

---

[8] The Court notes that some of the stricken exhibit materials would be otherwise improper for consideration. For example, the detailed list contained within [Filing No. 194](#) immediately above and underneath the heading, "Defendant [Republic] Recording Synopses," appears to be a single-spaced affidavit or declaration ostensibly completed by Williams that does not demonstrate it is made on personal knowledge or show that the affiant or declarant is competent to testify on the matters stated ([Filing No. 194 at 17-27](#)).  *See* Fed. R. Civ. P. 56(c)(4); *see also Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999) ("[S]tatements outside the affiant's personal knowledge or statements that are the result of speculation or conjecture or merely conclusory do not meet" the requirements set forth in Fed. R. Civ. P. 56(e), which is now carried forward under Rule 56(c)(4)). Nor is it dated or bearing a signature upon attestation that the statements therein were true under penalty of perjury. *See* 28 U.S.C. § 1746 (outlining that unsworn declarations, certificates, verifications, or statements — that are dated and subscribed "as true under penalty of perjury" — are allowed to have the same force and effect as sworn affidavits and declarations).

enacted "bullying tactics of targeting, harassment, discriminat[ion], retaliation . . . in violation of [Williams'] Company/CBA and Civil Rights," *id.* at 14; and

(4) Williams "finds Defendants['] support motion as frivolous, misleading as it omits relevant language as well." *Id.* at 24.

The requests to strike these statements is **denied**. Though perhaps impertinent, the Court interprets these statements as germane arguments in opposition to the motion for summary judgment. Rather than striking these statements, the Court will consider whether these statements are supported by admissible evidence. Any arguments that are not supported by admissible evidence lack merit and will not be considered.

Williams likewise requests in her response brief, without providing relevant legal authority or argument in support, that the Court "dismiss the Defendants['] Motions/Answers/Briefs/Replies and all associated filings with prejudice." (Filing No. 191 at 25.) Interpreting this request narrowly to pertain only to the summary judgment motion and related filings to which Williams was responding, the Court summarily **denies** this request and turns to consideration of Defendants' summary judgment motion.

### III.    SUMMARY JUDGMENT LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). That is, summary judgment is

appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. 317, 322 (1986); *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

The Court views the designated evidence in the light most favorable to Williams as the non-moving party and draws all reasonable inferences in her favor. *Bright v. CCA*, No. 10-cv-1690, 2013 WL 6047505, at *3 (S.D. Ind. Nov. 14, 2013). "However, employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Id.* (citation and quotation marks omitted); *see Reed v. Brex, Inc.*, 8 F.4th 569, 578 (7th Cir. 2021) ("Summary judgment is the proverbial put up or shut up moment in a lawsuit." (quotation marks and citations omitted)). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of

[the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). *See also* S.D. Ind. L.R. 56-1(h) ("The court has no duty to search or consider any part of the record not specifically cited in the manner described in subdivision (e)"), 56-1(e) (noting a "party must support *each fact the party asserts in a brief* with a citation" to admissible evidence) (emphasis added).

## IV.   DISCUSSION

Williams contends that despite being a high performer, the Defendants discriminated against her because of her race and after she complained and reported the discrimination to Republic's CEO, she was terminated in retaliation. Her operative Second Amended Complaint (Filing No. 100) includes five Section 1981 claims: (1) race discrimination against Gibson and Republic related to the September 20, 2019 meeting and paid suspension; (2) race discrimination against Defendants related to the October 18, 2019 meeting, associated retroactive suspension, and the Final Job Performance Warning; (3) retaliation related to the same; (4) race discrimination against Gibson and Republic related to the October 31, 2019 termination; and (5) retaliation related to the same. *See id.* at 13-14 (listing all claims under a single count).

Defendants seek summary judgment to each of Williams' claims contending she has produced no admissible evidence that Republic took any actions because of her race and, instead, the actions which were taken were based on legitimate, non-discriminatory reasons. The Court will assess the race discrimination claims first, and then turn to the retaliation claims.

### A.  Race Discrimination Claims

Section 1981 provides that "all persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens" and defines making and enforcing of contracts as "the making, performance, modification, and termination of

contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981; *see generally Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009 (2020). For a discrimination claim in the employment context to survive summary judgment, a plaintiff must produce evidence sufficient to "permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765; *see also Igasaki v. Illinois Dep't of Fin. & Prof'l Regul.*, 988 F.3d 948, 957 (7th Cir. 2021). The evidence must be considered as a whole instead of asking whether any piece of evidence proves the claim by itself. *Ortiz*, 834 F.3d at 765.

A plaintiff may survive summary judgment by satisfying the burden-shifting framework under by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In this framework, a plaintiff must put forward a *prima facie* case of racial discrimination by satisfying the following elements: (1) she is a member of a protected class; (2) she performed her job to her employer's expectations; (3) she suffered an adverse employment action; and (4) one or more similarly situated individuals outside her protected class received better treatment. *Smith v. Chicago Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015) (citing *Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th Cir. 2009)). If Williams makes this showing, then Republic can defeat the claims by articulating a legitimate, non-discriminatory reasons the employment action. Williams may then move forward with her claims only if she can demonstrate that Republic's proffered reason is pretextual--that is, a lie to hide discriminatory conduct. *Forrester v. Rauland-Bord Corp.*, 453 F.3d 416, 419 (7th Cir. 2006).

While it is uncontroverted that Williams is a member of a protected class, Defendants dispute whether she met legitimate performance expectations, suffered an adverse employment action when she received paid suspension and was issued the Final Job Performance Warning, or that any other similarly situated individuals outside the protected class received better treatment.

They further contend that Republic had legitimate, non-discriminatory reasons for issuing its suspension and in terminating Williams.

### 1. **Legitimate Performance Expectations**

Defendants argue its decisions were rooted in their non-discriminatory perception of Williams' conduct and performance: namely, her conduct prior to the issuance of the Final Job Performance Warning was contrary to Republic's standards of conduct, and she did not meet the company's legitimate performance expectation in its no-fault attendance policy at the time of her termination. Defendants argues that "Williams' conduct stood contrary to several of Republic's standards of conduct, any of which alone could have legitimately formed the basis for Williams' termination. As articulated in the Rjet Navigator, Republic's Employee Handbook, it is the policy of the Company to take disciplinary action, including termination, when an employee commits these offenses." (Filing No. 195 at 18).

Without citation to the record or provision of evidentiary support, Williams asserts she "was recognized as a high performer and a most successful Flight Attendant with numerous customer and peer surveys and remarks," and had "a good company record," "good customer and peer surveys," and "good exemplary reputation . . . , even as commended by [Republic] CEO Bedford" (Filing No. 191 at 3, 7, 12).  But even if produced, such evidence generally is insufficient to raise a question of fact about an employer's honest assessment of inadequate performance. *See, e.g., Gustovich v. AT & T Communications, Inc.,* 972 F.2d 845, 848 (7th Cir.1992) ("An employee's self-serving statements about his ability ... are insufficient to contradict an employer's negative assessment of that ability"); *Williams v. Williams Elec., Inc.,* 856 F.2d 920, 924 (7th Cir.1988) (employee's self-interested assessment of her own job abilities are insufficient to raise an issue of fact).

The Court takes notice of a September 18, 2019 email message by Williams to Bedford attaching "Customer Satisfaction Certificates" that Williams received from individual customers (Filing No. 176-11 at 253, 256). That same day Williams sent another email to Bedford sharing "three great reviews from Delta" outlining her interactions with their customers, to which Bedford congratulated her and shared he was not surprised and grateful to have her representing the brand, *Id.* at 251. In a third message exchange between the pair in July 2019, Bedford indicated remembering Williams' charm and hospitality on a flight. *Id.* at 250. These general statements of customer satisfaction are insufficient to create a material issue of fact as to whether a plaintiff was meeting her employer's legitimate employment expectations at the time she was terminated. *See, e.g., Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1460 (7th Cir.1994) ("Our cases ... give little weight to statements by supervisors or co-workers that generally corroborate a plaintiff's own perception of satisfactory job performance."). *See also Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1125 (7th Cir.1994); *Kephart v. Inst. of Gas Tech.,* 630 F.2d 1217, 1218–19, 1223 (7th Cir.1980).

Williams' efforts in striving for exemplary customer satisfaction are commendable, and even earned praise at points from Republic's CEO and a separate airline for which Republic flew. However, as outlined in detail in Section I of this Order, the designated evidence clearly establishes that Williams was not meeting legitimate expectations as set forth in the Manual, Handbook, and Collective Bargaining Agreement pertaining to both non-attendance conduct *and* the no-fault attendance policy. It is undisputed that Williams had progressed her way through Republic's no-fault attendance policy and was not meeting Republics legitimate expectations for a flight attendant during the probationary period.

Williams argues at length that Defendants "conspired a fabricated subject" — namely, her calls to crew scheduling on September 12 and 13, 2019 — to conduct the September meeting, organized a "witch hunt" and solicited false evidence to issue the Final Job Performance Warning, and falsely alleged her second No Call/No Show violation. These are essentially pretext arguments, most of which are built upon unsworn factual assertions that this Court must disregard since Williams failed to comply with the Local Rules.  Accordingly, the Court finds no genuine issue of material fact in dispute regarding this second prong.

2.   **Adverse Action**

Adverse employment actions are usually "economic injuries such as dismissal, suspension, failure to promote, or diminution in pay." *Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761–762 (1998) ("A tangible employment action in most cases inflicts direct economic harm.").   An adverse employment action can be one that imposes future financial harm since it "significantly reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced, so that the skills are likely to atrophy and his career is likely to be stunted." *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002).  Or it can be an action that subjects the employee to changes in her condition that are "humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative." *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004) (citing *Herrnreiter*, 315 F.3d at 744–745).  In any scenario, an adverse employment action involves "a significant change in employment status," *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (quotation and citation omitted), and must "materially alter the terms and conditions of employment." *Stutler v. Ill. Dep't of Corrs.*, 263 F.3d 698, 704 (7th Cir. 2001).

Defendants assert that the *paid* suspension and the issuance of the Final Job Performance Warning did not materially alter the terms and conditions of Williams' employment or constitute a significant change in status. Here, however, Williams was suspended with pay from September 20, 2019, until October 15, 2019, and suspended *without pay* from October 16, 2019, until October 18, 2019, when Republic issued the Final Job Performance Warning.

Concerning the paid portion of the suspension, this Court finds that Williams has not provided evidence that her employment status had significantly changed. As this Court has previously indicated, "Administrative leave . . . isn't materially adverse if the plaintiff keeps the same compensation, benefits, and position." *Tedrow v. Franklin Twp. Cmty. Sch. Corp.*, No. 1:21-CV-453 RLM-MG, 2023 WL 3602712, at *12 (S.D. Ind. May 23, 2023) (quoting *Nichols v. S. Ill Univ.-Edwardsville*, 510 F.3d 772, 787 (7th Cir. 2007) (leave pending fitness-for-duty exam), *on reconsideration in part*, No. 1:21-CV-453 RLM-MG, 2023 WL 6036009 (S.D. Ind. Aug. 18, 2023)). On the facts in the record, the paid suspension Williams experienced is functionally indistinguishable from an administrative leave. Moreover, she has not provided evidence that her compensation or benefits deviated from any received prior to September 20, 2019, and her position as flight attendant did not change after her suspension ended.

Conversely, the unpaid portion of the suspension, albeit three days in length, does constitute an adverse employment action from which Williams realized an economic effect. *See Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 647 (7th Cir. 2005) (citing *Markel*, 276 F.3d at 911) ("[A] suspension without pay — such as the three-day suspension that Whittaker was scheduled to serve between May 31 and June 2, 1999 — would constitute an adverse employment action"). The same is undeniably true for the termination. These findings satisfy the third prong of Williams *prima facie* case.

### 3.   <u>Similarly Situated Individuals</u>

Defendants argue persuasively that Williams cannot meet the fourth prong because she cannot show one or more similarly situated individuals outside her protected class received better treatment. Defendants assert that Republic uniformly enforced its policies, and no comparators — holding the same level of non-attendance related violations and attendance issues as Williams during their probationary period — received more favorable treatment than her. They designate two different lists of Republic flight attendants.  The first list indexes flight attendants who received discipline in 2019 for non-attendance related conduct (Filing No. 176-4 at 4), and it identifies at least three non-black individuals who Republic terminated for perceived misconduct, two of which occurred during the attendants' probationary period (Filing No. 176-11 at 1063–1064). The second lists flight attendants who were terminated during the period from January 1, 2019, to September 13, 2022, for attendance related reasons (Filing No. 176-4 at 5), and it identifies at least twenty-eight non-black individuals who were terminated for eight or more occurrences, eighteen non-black individuals who were terminated for two No Call/No Show events, and two non-black individuals who were terminated for both eight or more occurrences *and* two No Call/No Show events (Filing No. 176-11 at 1056–1062).

"Whether two employees are 'similarly situated' is a common sense [sic] inquiry that depends on the employment context." *Filar v. Board of Educ. of City of Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008) (citation omitted).  Although a comparator need not be identically positioned, "similarly situated employees must be 'directly comparable' to the plaintiff 'in all material respects.'" *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 365–366 (7th Cir. 2009) (quoting *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610–611 (7th Cir. 2006)). "Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course, the plaintiff has no

evidence from which a reasonable fact finder could conclude that the plaintiff met his burden on this issue." *Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 895 (7th Cir. 2018).

In her deposition, Williams testified that a white flight attendant with the first name of "Billy," last name unknown, was "known to be singing on flights" and he "was not disciplined". (Filing No. 176-6 at 79.) Without more, the Court cannot find that Billy ever participated in similar behavior (or was in probationary status) and, thus, is not an adequate comparator.

Williams next identifies Kate Baker ("Baker"), a white flight attendant who "had a number of occurrences and of which a number of what would be considered no call no shows." *Id.* at 97. When asked in her deposition about Baker's attendance, Williams admitted never speaking to Baker and was unable to provide any specifics or point to admissible non-hearsay evidence, except for a text message not within the record before the Court, concerning Baker's employment details. The Court likewise finds Baker an inadequate comparator. Unlike in Williams' case, the flight attendant union requested for Baker the equivalent of an extra-contractual last chance agreement, which it has never requested for a flight attendant, probationary or otherwise, with two No Call/No Show occurrences (Filing No. 176-4 at 4–5). And, importantly, Baker had served as a flight attendant for more than fourteen years when the last chance agreement was requested, while Williams was still on probationary status.

The "similarly situated" prong "establishes whether all things are in fact equal." *Filar*, 526 F.3d at 1061 (7th Cir. 2008) (citing *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)). In this case, they are not. While Williams "need not present a doppelganger who differs only by having remained in the employer's good graces" to make this showing, she has nevertheless failed to produce admissible evidence that the comparator is "still . . . similar enough 'to eliminate confounding variables, such as differing roles, performance histories, or decision-

making personnel, [so as to] isolate the critical independent variable: complaints about discrimination.'"[9]  *Id.* Accordingly, Williams fails to establish the fourth prong of a prima facie case.

### 4.  **Pretext**

Even if Williams had established a prima facie case of race discrimination, Republic defeats the claims by articulating a legitimate, non-discriminatory reasons the employment action. Republic asserts;

> "[n]either Williams' race, nor any other protected characteristic, nor her e-mails with Bedford, played a role in the Company's decision to terminate Williams' employment on October 31, 2019. Williams' non-attendance discipline likewise played no role in the termination decision. Rather, the Company terminated Williams' employment on October 31, 2019, in accordance with its no-fault attendance policy. Specifically, Republic terminated Williams' employment because of her two (2) No Call / No Show events within a twelve (12) month period and her accumulation of eight (8) occurrences within a rolling twelve (12) month period, each of which alone stands as grounds for termination."

(Filing No. 177 at 13).

Williams contends that Republic's proffered reason is a pretext for discrimination. She argues the Final Job Performance notice, "signed by Gibson, is a discriminatory slur, made against Plaintiff Williams, suggesting that because Plaintiff is African American that she knows, and/ or is related to all African Americans, stating that Plaintiff addressed Passengers and/or Family Members as Whitney Houston. This is a deliberate racist slur." (Filing No. 191 at 13.)  But Williams takes the language concerning Whitney Houston out of context. The Final Job Performance notice states that Williams allegedly addressed passengers and/or family members

---

[9] While Williams argumentatively compares her suspension to the treatment received by Gibson, a "manager" who violated a different Republic policy, it remains unclear if she additionally alleges him to be a proper comparator (Filing No. 191 at 18–19); nevertheless, as she has provided no evidence that he is "directly comparable" "in all material respects," she cannot show him to be such.  *Patterson*, 589 F.3d at 365–366.

inappropriately as "Whitney Houston," (*see* Filing No. 176-11 at 248).  In this context, the Court believes no racial slur can be inferred.

The recordings and other designated evidence support that Defendants honestly believed Williams had incurred two (2) No Call / No Show events and eight (8) attendance occurrences in violation of the Company's attendance policy found in the Flight Attendant CBA.  Republic's decision to issue the October 27, 2019 No Call/No Show occurrence — caused when Williams lost cell phone service while the train was stalled underground — appears harsh.  But it is not the role of the Court to "question the wisdom of a company's decisions on how to run its business," rather the courts role is "only to assure that such decisions are not intended to provide cover for illegal discrimination." *Johal v. Little Lady Foods, Inc.*, 434 F.3d 943, 946–47 (7th Cir. 2006)*.*  Because of the nature of its business, the Court cannot question the reasonableness of Republic's no-fault attendance policy.  Moreover, an employer can make a mistake or act unfairly when it comes to making personnel choices while still not being discriminatory in its decision-making.  The Seventh Circuit has consistently held that the courts "do not sit as a kind of 'super-personnel department' weighing the prudence of employment decisions made by firms charged with employment discrimination." *O'Regan v. Arb. Fs., Inc*., 246 F.3d 975, 984 (7th Cir. 2001) (quoting *Wollenburg v. Comtech Mfg. Co.*, 201 F.3d 973, 976 (7th Cir. 2000)).  The evidence does not support Williams' position that Republic's proffered reason for her termination was pretextual.  Instead, the evidence shows Republic's proffered reason was honest and a legitimate non-discriminatory basis for terminating an employee.

Viewing the evidence in the light most favorable to Williams, she has not raised a triable issue as to whether she performed her job to her employer's expectations or that one or more similarly situated individuals outside her protected class received better treatment; and she has

failed the *prima facie* test for determining discrimination under *McDonnell Douglas*. After considering the evidence submitted as a whole, no reasonable factfinder could conclude that Williams' race caused the adverse employment action(s). Accordingly, summary judgment is **granted** on Williams' race discrimination claims.

### B. Retaliation Claim

As for her retaliation claim, Williams argues the Defendants issued the retroactive suspension and Final Job Performance Warning on October 18, 2019, and ultimately terminated her employment, in unlawful response to engaging in the protected activity of writing Bedford to complain of both Gibson's treatment of her during the September meeting and what she perceived to be a lack of investigation prior to Republic issuing the initial suspension. Specifically, in her September 24, 2019 email message to Bedford, titled in part, "Request for Immediate Assistance," Williams expressed worry of "being ostracized and falsely accused without a fair trail [sic]" and asserted Gibson "had his mind made up regarding [her] fate, . . . as he only spoke on what can be classified as[]hearsay." (Filing No. 176-11 at 255.) In her reply to Bedford's response, Williams indicated she was perplexed by being "accused of 25 offenses without ever being confronted of the first accusation/offense." *Id.* at 254.

To survive summary judgment on her retaliation claims, Williams must show evidence of "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Abebe v. Health & Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 607 (7th Cir. 2022) (quoting *Humphries*, 474 F.3d at 404). For purposes of retaliation, an adverse employment action is one that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

Williams fails to prove the first and last element. While Williams' response mentions Defendants purported "retaliation" against her, no reasonable juror could find that she engaged in statutorily protected activity. A complaint of discrimination is a protected activity only if the discrimination is based on a protected characteristic like race. *Miller v. Chicago Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021) (citing *Smith v. Ill. Dep't of Transp.*, 936 F.3d 554, 559–60 (7th Cir. 2019)). The Court finds no evidence in the record that Williams complained to Bedford about racial discrimination; indeed, her September 24, 2019 letter is void of any mention of race, and only mentions a strong belief she was "being targeted and even set up". (Filing No. 176-11 at 254–255.) In her deposition, Williams described writing Bedford to let him know "what was going on" and sending information by email to let him know "this is [her] character, this is how [she was] conducting [her]self professionally on the aircrafts." (Filing No. 176-6 at 59). When asked for the basis for her belief about retaliation related to the communication with Bedford, she explained:

> I reached out to Mr. Bedford regarding the tones that were taken, regarding unfounded information that was being shared against my person, against my reputation. I found it offensive. So, therefore, I reached out to Mr. Bedford . . . . After which time, I then began receiving . . . a number of push-backs [sic].

(Filing No. 176-7 at 102.)

The Court does not doubt that Williams felt indignation, and that she perceived racial microaggressions — perhaps from the tone of the meeting or Gibson's tone; but without more this does not show the perceived connection was conveyed to Bedford. "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006); *Miller*, 20 F.4th at 1155 ("Miller stated that he felt he was being 'targeted' and treated unfairly by Bonds, but his EEO complaint to Kapadia did not mention a reason for this treatment and certainly did not attribute it to race."). The designated

33

evidence shows that Williams complained only about Gibson sharing unfounded information and Gibson's offensive tone, without any complaints related to race. Thus, the evidence does not support the first element of a retaliation claim — that plaintiff engaged in protected activity.

Additionally, Williams fails to show that, but-for her complaints to Bedford, Defendants would not have taken the adverse actions. To show causation, employees may point to circumstantial evidence, such as "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 761 (7th Cir. 2022) (quoting *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019) (internal quotation marks omitted)). Plaintiffs may also make use of the *McDonnell Douglas* framework. *Id.* (citing *McDaniel v. Progress Rail Loco., Inc.*, 940 F.3d 360, 370 (7th Cir. 2019)). Ultimately, "[t]he key question is whether a reasonable juror could conclude that there was a causal link between the protected activity or status and the adverse action." *Rozumalski*, 937 F.3d at 924 (citing *Ortiz*, 834 F.3d at 765–766)).

In an effort to casually connect her communications to the termination, Williams asserts Gibson and others disregarded an interpretation of Article 29 of the Collective Bargaining Agreement, which she contends "would . . . excuse [her]" from incurring the second No Call/No Show (Filing No. 191 at 6, 22–23 (accusing Defendants of conspiring to "alter the language" of Article 29, "for the sake of protecting the illegal behavior of [Republic] managers/directors")). As discussed above, however, Williams was terminated for legitimate reasons tied to Republic's no-fault attendance policy, and she does not point to evidence in support of the claim that Republic actually applied such a favorable interpretation, or evidence that would otherwise support the reasons underlying her termination were pretextual. Her conviction that Gibson lied in taking the

adverse actions does not convince the Court otherwise, irrespective of whether he increased the number of "abusive calls" which he cited during the meetings.  Williams must provide more than mere assertions or speculation.

Accordingly, a reasonable factfinder could not return a verdict in Williams' favor on her retaliation claim.  Thus, summary judgment is **granted** on Williams' retaliation claims.

## I.   CONCLUSION

For the reasons discussed above, Defendants' Motion for Summary Judgment (Filing No. 176) is **GRANTED.**

The **Clerk is directed to strike** Williams' duplicative responses filed at Filing No. 189 and Filing No. 190, and the untimely materials filed at Filing No. 192, Filing No. 193, and Filing No. 194.

Final judgment will issue in a separate order.

**SO ORDERED.**

Date:  11/3/2023

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Tae K. Sture
STURE LEGAL SERVICES LLC
tae@sturelaw.com

David J. Carr
ICE MILLER LLP (Indianapolis)
david.carr@icemiller.com

Paul Conrad Sweeney
ICE MILLER LLP (Indianapolis)
paul.sweeney@icemiller.com